IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDWEST GENERATION, LLC,  )
                          )
            Plaintiff,    )
                          )
     v.                   ) No. 05 C 1017
                          )
CARBON PROCESSING AND     )
RECLAMATION, LLC,         )
                          )
            Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Midwest Generation, LLC ("Midwest") is an independent producer of power and electricity with its principal place of business in Chicago, Illinois. Defendant, Carbon Processing and Reclamation, LLC ("Carbon") is a limited liability company with its principal place of business in Birmingham, Alabama. On September 14, 2004, Midwest issued a Request for Proposal (the "RFP") seeking buyers for approximately 300,000 barrels of fuel oil stored in Tanks 02 and 03 at its Collins Generating Station in Morris, Illinois. The RFP stated that the fuel oil was to be sold "As Is." Attached to the proposal was a report created by an independent laboratory, SGS North America ("SGS"), describing the test results of samples taken from the two tanks. According to the report, Tank 02 contained No. 6 Fuel Oil with a water content of 39.8%. Tank 03 contained No. 6 Fuel Oil with a water content of 1.1%. The RFP also contained a limited

1

warranty stating that "Seller represents and warrants that the Fuel Oil shall conform to the description and specifications contained in analysis as performed by SGS on shore tank at Collins Station dated August 18, 2004."

A Carbon employee, John Carter ("Carter"), responded to the RFP. In his response, Carter expressed Carbon's desire to purchase the approximate 300,000 barrels. Thereafter, Carbon was selected by Midwest to purchase approximately 150,000 barrels of the fuel oil. The parties negotiated a purchase contract for Carbon to buy the fuel oil in four separate lifts. The contract listed the Product being sold as "No. 6 Residual Fuel Oil." The contract stated that the first lift would take place on September 26, 2004 and include approximately 30,000 barrels; that the second lift would take place on October 6, 2004 and include approximately 30,000 barrels; that the third lift would take place on October 14, 2004 and include approximately 30,000 barrels; and that the fourth lift would take place on October 25, 2004 and include approximately 65,000 barrels. The contract also stated that of the total barrels delivered, approximately 20,000 barrels would be taken from Tank 02 and approximately 130,000 barrels would be taken from Tank 03.[1] The section of contract entitled "Quality" described the fuel oil as being sold "'As Is'" per Report of Test on Tanks #03 and #02

---

[1] These volumes add up to 155,000 barrels, whereas other parts of the contract state a total volume of 150,000. This discrepancy is not explained, but is not material to this action.

from SGS dated August 18, 2004." The section of the contract entitled "Price" provided for a price adjustment for excess water found in the fuel oil from Tank 02 and read in part, "[i]f in excess of 1% water, material from tank #02 only will be price adjusted to a maximum of 1% water content." The agreement contains an integration clause and prohibits incidental and consequential damages. Carbon was responsible for payment for the actual quantity delivered and the price per barrel was calculated using a formula that incorporated "Platt's 3% Published Gulf Coast Low."

The first lift was made in late September, 2004 from Tank 03 and consisted of 22,153 barrels. The fuel oil had a water content of 1.6%. Even though the water content of the fuel oil was in excess of 1.0%, because the fuel oil was taken from Tank 03, the price adjustment clause did not apply and no adjustment was made to the price of the lift. Carbon paid in full for the lift.

After the first lift, Midwest and Carbon amended the original contract. A provision was added that allowed Carbon to receive a price discount for fuel oil taken from Tank 03 as well as Tank 02. The new provision read: "There will be no adjustment for water content for the 1st lift, subsequent lifts will be adjusted to 1% water content." At this time, the parties also added a fifth lift of 15,000 barrels to the contract.

The second lift of 23,463.70 barrels came from Tank 03 and took place in October, 2004. The fuel oil had a water content of

1.6%. Because the water content exceeded 1.0% by .6%, a price adjustment of .6% was made to the total. The third lift of 65,168 barrels came from Tank 03 and also took place in October 2004. The fuel oil had a water content of 2.6%. Accordingly, a price adjustment of 1.6% was made to the price of the third lift.

The fourth lift of 11,812 barrels also came from Tank 03 and took place on October 30, 2004. The fuel oil had a water content of 7.5%. Accordingly, a price adjustment of 6.5% was made to the total price in the invoice sent to Carbon. Carbon received an invoice for a price adjusted total of $300,413.72. To date, Carbon has not made any payment. As a result of Carbon's failure to make payment, Midwest filed a claim for breach of contract against Carbon.

Unrelated to the above transaction, in October, 2004, Carbon offered to buy a quantity of No. 2 Fuel Oil (diesel) from Midwest. In a phone conversation on October 22, 2004, Sarah Kamm ("Kamm") and Larry Siler ("Siler") of Midwest had a discussion with Carter regarding Carbon's proposal. Carbon claims that it reached an agreement with Midwest to purchase the No. 2 Fuel Oil during this conversation and Midwest has failed to deliver the fuel oil under the terms of that contract.

In response to Midwest's claim, Carbon brought three counter-claims against Midwest: 1) a breach of contract claim for the No. 6 Fuel Oil; 2) a claim for misrepresentation stemming from the No.

6 Fuel Oil contract; and 3) a breach of contract claim for the No. 2 Fuel Oil. The parties have filed cross-motions for summary judgment.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

I. Cross-Claims for Breach of No. 6 Fuel Oil Contract

Midwest delivered the fourth lift of fuel oil containing 7.5% water and has yet to receive payment. Carbon argues that the fuel oil it received on the fourth lift was nonconforming and it therefore has no obligation to pay. Carbon presents two theories as to why the fuel oil did not conform to the terms of the contract. First, Carbon argues that the fuel oil was not actually No. 6 Fuel Oil because, according to its expert, Douglas Smoot, and the American Society of Testing Materials ("ASTM") standards, No. 6 Fuel Oil can have a maximum water content of 2.0%.[2] Second,

---

[2] From the record, it is unclear to this court whether fuel oil that otherwise would qualify as No. 6 Fuel Oil, but for the fact it had a water content greater than 2.0%, is properly

5

Carbon argues that the fuel oil delivered did not conform because it contained unspecified amounts of No. 2 and No. 5 fuel oil. Because Midwest delivered nonconforming goods, Carbon argues that it had the right to reject the fourth lift.

Midwest responds that Carbon got exactly what it contracted for, the residual fuel oil from Midwest's tanks, which the parties referred to as No. 6 Fuel Oil in the contract, regardless of any industry standards. Midwest argues that the parties specifically contemplated that fuel oil could be delivered with water in excess of that represented in the SGS report (1.1% in the case of the fourth lift which came from Tank 03) and that the remedy for excess water was to be the price adjustment described in the contract. Moreover, Midwest argues that even if the fourth lift was nonconforming, Carbon did not properly reject the lift and is therefore obligated to pay for the fuel oil.

Turning to Carbon's first theory, since the parties did not define the term "No. 6 Fuel Oil" in their contract, the meaning of that term is an issue of contract interpretation. When interpreting the language of a contract under Illinois law, the court follows the four corners rule. *Air Safety v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (Ill. 1999). "If the language of the contract is facially unambiguous, then the contract is interpreted

---

characterized as defective No. 6 Fuel Oil or some other substance altogether.

6

by the trial court as a matter of law" without resort to extrinsic evidence *Id.* Only if the language is susceptible to more than one interpretation, does the court turn to extrinsic evidence to resolve the ambiguity. *Id.* "The primary object of the construction of a contract is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to any particular words used in expression thereof." *Martindell v. Lake Shore Nat'l Bank*, 15 Ill. 2d 272, 283 (Ill. 1958). Interpretation of each provision of a contract is to be done in light of the other provisions of the contract and is "not to be determined by reference to particular words or isolated phrases". *Illini Fed. Sav. & Loan Ass'n v. Elsah Hills Corp.*, 112 Ill. App. 3d 356, 361 (Ill. App. Ct. 1983).

Looking at the contract as a whole, it is clear that the parties intended to contract for the specific fuel oil contained in Midwest's Tanks 02 and 03 and referred to that specific fuel oil in the contract as No. 6 Fuel Oil, regardless of its water content. The contract describes the fuel oil sold as "[a]pproximately 20K barrels from Tank #02 and 130K barrels from Tank #03." Directly beneath that language, the contract states that the quality of the fuel oil is "'As Is' per report of Test on Tanks #03 and #02 from SGS dated August 18, 2004 attached." The attached SGS report states that Tank #02 contains No. 6 Fuel Oil with a water content of 39.8% and that Tank #03 contains No. 6 Fuel Oil with a water

content of 1.1%. The language of the contract unambiguously demonstrates that the term No. 6 Fuel Oil was used to describe fuel oil having a water content of up to 39.8%. Thus, Carbon's argument that the fuel oil delivered was not No. 6 Fuel Oil because its water content exceeded the 2.0% industry standard fails.[3]

Furthermore, even if Carbon could establish that the fuel oil was nonconforming, Midwest is entitled to summary judgment because Carbon did not effectively reject the fuel oil in the fourth lift. "Section 2 -- 606 of the Uniform Commercial Code provides that acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods, (1) notifies the seller of

---

[3] Whether or not the Midwest breached the contract by delivering fuel oil from Tank 03 with water in excess of the 1.1% represented in the SGS report is a separate question. This court's opinion resolving an earlier motion to dismiss noted that the contract was silent as to whether the parties intended the excess water price adjustment in the amended contract to apply to fuel oil from Tank 03 with greater than a 1.1% water content. Midwest has now presented substantial evidence of the parties' course of performance supporting its position that the parties did in fact intend the price adjustment to apply to fuel oil from Tank 03 with a water content in excess of 1.1%. For example, Midwest has shown that the amendment allowing for price adjustments for Tank 03 fuel oil was added after Carbon received the first lift from Tank 03 which had a water content of 1.6%; that the first three lifts had water contents of 1.6%, 1.6%, and 2.6% respectively and were accepted by Carbon with a corresponding price adjustment; and that Carbon has not brought forth any evidence that it told Midwest that it believed any of the first three lifts to be nonconforming when it accepted them. In its brief in opposition to the earlier motion to dismiss, Carbon had made the argument that Midwest had breached the contract in this manner. Now, in its briefs on the cross motions for summary judgment, Carbon has abandoned this theory as a basis for its breach of contract claim. Accordingly, the court does rule on this issue.

8

acceptance, (2) fails to make an effective rejection or (3) 'does any act inconsistent with the seller's ownership.'" *Phil Jacobs Co. v. Mifflin*, 23 Ill. App. 3d 999, 1002 (Ill. App. Ct. 1974).

Carbon received the fourth lift on or about October 30, 2004. On November 12, Carter sent an email to Kamm stating:

> Per our amended purchase to handle the water content greater than 1.00%. We agreed to use the static shore tank at Midwest Generation - Morris, IL. This is tank #3. The adjusted figures are as follows.
>
> #6 fuel oil delivery (and a substantial volume of water) at Morris, IL.
> 1. Shore tank #3 delivered 11,812.43 barrels, **with a water content of 7.50%**
>    11,812.43 barrels
>    X 0.935 (7.5% - 1.00% = 6.5% volume adjustment)
>    11,044.62 barrels adjusted for water.
>
> 2. Invoice Volume = 11,044.623 barrels.

The wording of Carter's email indicates acceptance. Additionally, the email demonstrates that Carter had knowledge of the alleged nonconformity (the water content level of 7.5%) at the time he wrote this email.

Carbon also took actions inconsistent with Midwest's ownership of the fuel oil. Rather than holding the fuel oil "with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove [it]," Carbon sold the fuel oil to another company. 810 ILCS 5/2-602(2)(b); *Fabrica De Tejidos Imperial v. Brandon Apparel Group*, 218 F. Supp. 2d 974, 978 (N.D. Ill. 2002) ("Resale of goods--even after a timely rejection--has long been

9

recognized as inconsistent with the seller's continued ownership and as constituting an acceptance of the goods.").

Finally, based upon the evidence brought forth by Carbon, a reasonable fact-finder could not conclude that Carbon effectively rejected the fourth lift. On November 12, Carter sent a second email to Kamm voicing displeasure with the fuel oil. In the email, Carter stated, "Carbon Processing has endured substantial hardship due to delivery of water from this transaction." The email contains a complaint about the water content of the fourth lift and suggests that the fuel oil does not conform with the terms of the contract. Mere complaints are not enough to meet the UCC standard for rejection. See Id. at 977 ("[A] complaint about the quality of goods is simply not the same thing as a rejection."). Additionally, in his deposition, Carter also testified that at some point in time he may have asked Midwest to take the fuel back.[4] Taken in the light most favorable to Carbon, this testimony shows that Carter asked Midwest to take the fuel oil back and Midwest refused. This is far from the clear and unambiguous rejection contemplated by the UCC.[5] See e.g. CMI Corp. v. Leemar Steel Co.,

---

[4] Carter stated: "I believe we asked . . . I believe we did say, you know, you want this back?"

[5] Attached to its reply brief, Carbon also submitted an affidavit from Carter intended to supplement his deposition testimony. The affidavit stated that Carbon did in fact ask Midwest to take the fuel oil back and that Midwest refused. Carter's affidavit is not considered in this motion. The affidavit was first introduced as an attachment to Carbon's reply

10

733 F.2d 1410, 1414 (10th Cir. 1984) ("Seasonable notice of rejection requires that a buyer give the seller clear and unambiguous notice of his rejection within a reasonable time."); *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 552 (Ind. Ct. App. 1987). Carbon has not pointed to any evidence beyond this single alleged oral conversation in support of its theory of rejection. Moreover, even if this evidence somehow were to be construed as an effective rejection, it is inconsistent with Carbon's other actions, which would render it ineffective.[6]

Carbon's second theory as to why the fuel oil in the fourth lift did not conform to the terms of the contract and was properly rejected is that the fuel oil delivered contained unspecified

---

brief and contains facts not mentioned in Carbon's statement of material facts or at any other point in this litigation. Also, by failing to specify when the alleged "rejection" was made, it lacks the factual specificity necessary for the court to determine if any such "rejection" was timely in relation to the other evidence in this case.

[6] On the one hand, if the alleged rejection came before the first November 12 email, that email indicating acceptance would override the earlier rejection. *See* 810 ILCS 5/2-606 comment 4 ( "[A] buyer . . . can obligate himself by a communication of acceptance despite a prior rejection . . . ."). On the other hand, if the alleged rejection came after that email, it is ineffective because a rejection may occur only prior to acceptance. 810 ILCS 5/2-607(2) ("[A]cceptance of goods by the buyer precludes rejection of the goods accepted . . . ."). Under 810 ILCS 5/2-608, a buyer may, however, revoke his acceptance. A buyer may do so, however, only if he accepted the goods "without discovery of such non-conformity. . . ." In this case, the first November 12 email demonstrates that Carbon had knowledge of the 7.5% water content at that time. Therefore, any argument that Carbon actions effectively revoked its acceptance also fails.

11

amounts of No. 2 and No. 5 fuel oil. Unlike its claim of excess water, however, Carbon does not claim that it ever notified Midwest of this alleged defect in the fuel oil. Even though Carbon was aware of the characteristics of the fuel oil of all four lifts from the time of delivery (or shortly thereafter), the first time Carbon raised this issue is in its briefs on the cross motions for summary judgment. Therefore, even if this could possibly be construed as a proper basis for rejection, the fact that Carbon waited over one year and only put Midwest on notice of this alleged defect in response to Midwest's lawsuit against it makes this claim untimely. Illinois law requires that a rejection "be within a reasonable time after . . . delivery or tender." 810 ILCS 5/2-602(1). Additionally, Carbon has not even attempted to demonstrate that the presence of unspecified amounts of No. 2 and No. 5 Fuel Oils in the fuel oil (which Midwest claims were "trace amounts" and consistent with the composition of *residual* fuel oils) "substantially impair[ed] the value" of that lift. 810 ILCS 5/2-612(2). The only issues of damage or impairment Carbon has argued throughout this entire case relate to the presence of excess water. Carbon has not made any showing (or even argued) that the presence of excess water was caused by or related to the presence of these other fuel oils.

For the above reasons, I grant Midwest's motion for summary judgment on its claim for breach of contract and deny Carbon's motion for summary judgment on its claim for breach of contract.

## II. Carbon's Claim for Misrepresentation

Carbon claims it was fraudulently induced into entering the contract for No. 6 Fuel Oil by Midwest's misrepresentations regarding the product being sold. In order to establish a claim for fraud, Carbon must show: "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir. 1996).

Carbon argues that there are facts in both Carter's and deposition testimony and Siler's deposition testimony that support this claim. In Carter's deposition, Carter testified that when he visited Midwest's plant in late October or early November 2004, an employee told him that Midwest had intentionally introduced water into a tank to facilitate removal of the fuel oil. Therefore, Carbon argues that Midwest misrepresented the water content of the fuel oil. Carbon's argument based upon Siler's testimony asserts that because Siler knew that the fuel oil being sold contained unspecified amounts of No. 2 and No. 5 Fuel Oil, he knowingly misrepresented the fuel oil as being No. 6 Fuel Oil.

Both of Carbon's theories fail. Assuming Carbon could establish that an introduction of water into Tank 03 actually did

13

take place, Carbon has not submitted any evidence to support a finding that Siler, Kamm, or any other Midwest employee involved in the formation of the contract for No. 6 Fuel Oil with Carbon was aware that any introduction took place or was going to take place prior to delivery. Thus, there is no evidence from which a fact-finder could conclude that any Midwest employee knowingly misrepresented to Carbon the water content or falsified the SGS report. Carbon's claim is based upon speculation and relies on conclusory allegations, which are insufficient to survive summary judgment. *Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 (7th Cir. 1996) ("Conclusory allegations are not enough to defeat summary judgment.").

Carbon's theory of fraud based upon the presence of No. 2 and No. 5 fuel oils in the fourth lift fails for the same reasons that its breach of contract claim based upon this theory failed. Most fundamentally, Carbon has failed to show any evidence that it suffered any damages as a result of the presence of these other fuel oils. I therefore grant Midwest's motion for summary judgment on this claim.

### III. Carbon's Claim for Breach of No. 2 Fuel Oil Contract

Carbon brings a breach of contract claim arguing that it formed a contract to purchase No. 2 Fuel Oil (diesel) from Midwest and Midwest never delivered. According to Carbon, Carter reached an oral agreement to purchase the No. 2 Fuel Oil with Kamm and

Siler in a telephone conversation. In arguing that such an oral contract is valid, Carbon relies on Carter's testimony that "oil is traded in this industry on a phone call, and when somebody says 'done deal,' it's a done deal." Assuming the parties had reached an oral agreement, in order to satisfy the statute of frauds, that agreement would need to be evidenced by "'some writing sufficient to indicate that a contract for sale has been made.'" *Central Illinois Light Co. v. Consolidated Coal Co.*, 349 F.3d 488, 489 (7th Cir. 2003). In its briefs on the cross motions for summary judgment, Carbon makes no attempt to argue that any writing in the record is sufficient to prove the existence of the oral contract and satisfy the statute of frauds.

The record does contain an email sent by Kamm to Carter on November 12, 2004. I agree with Midwest, however, that this email is insufficient written evidence of an oral contract to satisfy the statute of frauds. Although Kamm's email to Carter contains many details of the potential transaction, it begins by stating that it is a "recap" of the parties' discussions of Carbon's "proposal" and concludes by stating that "[w]e will need to complete a sales order with terms and conditions acceptable to Midwest Generation." Additionally, after receiving the email, Carter wrote to another Carbon employee on October 25: "Bill, please review and let me know any conditions you would like to modify." The language of Kamm's email and Carter's email to his colleague show that the

15

parties were engaged in ongoing negotiations and that no contract existed at the time. *See e.g. PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 731 (7th Cir. 2005) ("When negotiators say that agreement is subject to a more definitive document, Illinois treats this as demonstrating intent not to be bound until that document has been prepared and signed."). Also, the parties' prior dealings (i.e. the contract for No. 6 Fuel Oil) demonstrate that the parties intended a final agreement to be memorialized in a written sales order. Further undermining Carbon's argument that it believed it had a contract to purchase No. 2 Fuel Oil is the fact that it has not pointed to any evidence in the record that Carbon ever attempted to pay for, arrange shipment, or otherwise enforce this contract prior to its filing of a counterclaim against Midwest.

Carbon also could not successfully argue that Kamm's email was an offer that was later accepted by Carter. On October 29, Carter sent an email to Kamm attempting to accept the terms of the proposal. Kamm immediately responded to Carter in an email stating:

> As per my conclusion in my last email, This concept has yet to be approved by both the cleaning project leaders as well as MWG upper management. No sales order has been issued at this time; the terms and conditions are under [*sic*] currently under review. Larry will advise when and what decision has been made by upper management regarding this material, until then please be patient.

Carter wrote back: "Once you work out your details let me know." As

previously discussed, Kamm's "recap" email was only evidence of ongoing negotiations. *Id.* Therefore, Midwest could not be bound by Carter's attempted acceptance.

For the above reasons, I grant Midwest's motion for summary judgment on this claim.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 25, 2006